IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SEAN TILGHMAN, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-20-1842 |
| | * | |
| CENVEO WORLDWIDE LIMITED, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Sean Tilghman ("Plaintiff") filed a Complaint against his former employer, Cenveo Worldwide Limited, alleging that he was subjected to a racially hostile work environment and was retaliated against when his employment was terminated. ECF 1. Discovery is now concluded. Defendant filed a motion for summary judgment, ECF 14, which I have reviewed along with the relevant exhibits, opposition, and reply. ECF 15, 16, 19. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant Defendant's Motion for Summary Judgment.

## I.    FACTUAL BACKGROUND

The facts contained herein are taken in the light most favorable to Plaintiff, the non-moving party. Cenveo, a provider of printed items such as envelopes, labels, and commercial materials, consolidated a facility it owned in New York into its facility in Hurlock, Maryland in the summer of 2018. ECF 14-3 ¶¶ 4, 7. As the Hurlock facility was expanded to accommodate the consolidated work, Cenveo hired Plaintiff into a lead position in its Fulfillment Department. *Id.* ¶¶ 9. As warehouse lead, Plaintiff managed and received inventory in the Hurlock warehouse, and supervised the warehouse team. ECF 14-12 at 38:2-7.

Later in 2018, Cenveo learned that its newly expanded Hurlock facility would lose certain business.  ECF 14-3 ¶¶ 14, 15.  It directed Tom Veitch, the General Manager at Hurlock, to commence a reduction in force to cut the facility's costs.  *Id.* ¶¶ 16.  Veitch and the Regional Human Resources Manager, Laurie Burger, began a discussion of possible position eliminations, as evidenced by their contemporaneous email exchanges and handwritten notes.  *Id.* ¶ 16-20. Preliminarily, they determined that they would eliminate one lead position and two customer service positions.  *Id.*  At the time, there were five employees serving in lead positions at the Hurlock facility.  *Id.* ¶ 21.  Four of those five employees were African American.  *Id.* ¶ 22.  Of the five, Plaintiff's service at the Hurlock facility had begun most recently, so he was deemed to have the least seniority and was identified as the lead position that would be eliminated.  *Id.* ¶¶ 23-26. However, Veitch and Burger decided to delay the elimination of Plaintiff's position until appropriate coverage was in place.  *Id.* ¶ 27.

On April 9, 2019, Plaintiff participated on a conference call with eight other employees to discuss an inventory counting solution.  ECF 14-12 at 40:6-17.  Three of those employees, Plaintiff, Tommy Miller, and Dan Daye, were together on the warehouse floor during the call.  *Id.* at 40:18-41:4.  The other six participants were alone at their respective home or office locations. ECF 14-8 at 1.  The employees in the warehouse tried to keep the phone on mute to avoid interruptions from warehouse noise.  ECF 14-12 at 40:18-21.  About halfway through the call, while Patti Ann Christie was speaking, Plaintiff heard a voice "all of a sudden" say "you f****** b****, you black n*****" ("the Statement").  ECF 14-12 at 41:7-9; 53:10-13.  Plaintiff did not recognize the male speaker's voice and does not know who made the Statement.  *Id.*  He also does not know if the Statement came from a participant on the call or from "somebody else that got on

the Webex through the company." *Id.* at 53:7-9.  However, because Plaintiff was the only African American participant on the call, he believes the Statement was directed at him.  *Id.* at 54:4-10.

Miller and Daye, who were with Plaintiff in the warehouse, heard the "n-word" used during the call.  *See, e.g.*, ECF 14-14 (Miller Aff.); ECF 14-16 (Daye Aff.).  Neither Miller nor Daye believed the Statement was made by a call participant.  ECF 14-14 ("I was acquainted with everyone on the conference call and I know their voices.  I would have known if one of the participants was the one to use the "n-word."); ECF 14-16 ¶ 8 (same).  Miller believed one of the participants in the call had been on their cell phone on the street, and the Statement had been made by a passer-by.  ECF 14-14 ¶ 7.  Daye thought a non-participant had intercepted the call or had cut in on the line.  ECF 14-16 ¶ 6.  Other participants in the call, who were not in the warehouse, did not hear any racial slurs at all.  *See* ECF 14-13 (Chintella Aff.) ("I did not hear the "n-word" used by any call participant or in the background on the shop floor."); ECF 14-10 (Veitch Depo.) at 6:9-19 (testimony that he heard the "b word" but not the "n word" during the call and did not know where it had come from); ECF 14-15 (McCord Depo.) at 7:14-18 (testimony that he did not hear any racial or derogatory comments during the call); ECF 14-18 (Gottlieb Aff.) ("I took the call remotely and could hear a lot of background noise on the call from the participants who were near the shop floor.  I did not hear the 'n-word' used by any call participant or in the background on the shop floor during the teleconference.").

Shortly after the call, Plaintiff reported the incident to his supervisor, Larry McCord.  ECF 14-15 at 63:4-10.  McCord gave Plaintiff permission to leave work for the day.  ECF 15-2; ECF 14:15 at 64:9-11.  Also on April 9, 2019, without any knowledge of the incident or Plaintiff's conversation with McCord, Burger, the HR representative, requested Cenveo corporate approval to eliminate two positions at the Hurlock facility, including Plaintiff's.  ECF 14-3 ¶ 29; 35-36.

Corporate approval was received on April 10, 2019. *Id.* ⁋ 30. When Burger told Veitch that the eliminations had been approved, he indicated that he would talk to the affected employees' supervisors to finalize plans for transition. *Id.* ⁋⁋ 31-32

When Veitch went to McCord on April 11, 2019 to inform him that Plaintiff's position would be eliminated, McCord first informed Veitch "that [Plaintiff] had heard a remark that he was offended by." ECF 14-10 at 7:6-14. Veitch immediately reached out to Burger to discuss the situation. *Id.* at 9:12-14. Veitch also called three of the other participants in the April 9, 2019 call to determine what they had heard. *Id.* at 14-17. Burger began an HR investigation to determine what had happened during the conference call, including interviews with McCord, Veitch, and Chintella. ECF 14-3 ⁋⁋ 37-38. Several call participants told Burger that they had heard loud background noises coming from the warehouse floor. *Id.* ⁋ 39. Only Miller, Daye, and Plaintiff, who had been on the warehouse floor, reported having heard the "n-word." *Id.* ⁋ 40. Burger did not interview Plaintiff during the investigation, because she believed it would be "awkward," since his position had just been marked for elimination. ECF 15-3 at 39, 40. After concluding her investigation, Burger determined that none of the employees on the conference call had made the Statement or had used the "n-word." ECF 14-3 ⁋ 41. She believed the Statement likely originated at the warehouse, either as a statement by an employee on the warehouse floor or from another source such as an audio speaker or cell phone. *Id.* ⁋⁋ 42-43.

On May 1, 2019, Plaintiff's position was eliminated and his duties were divided amongst three existing employees. *Id.* ⁋⁋ 45-46. Plaintiff believed that his employment was terminated in retaliation for his complaint about the April 9, 2019 conference call. ECF 14-12 at 95:2-4. He had not reported any other concerns or incidents of harassment to Cenveo and had not experienced any other racial slurs or race-based comments during his employment. ECF 14-12 at 39:18-40:3.

On May 27, 2019, several weeks after Plaintiff's termination, Cenveo learned that Plaintiff had

filed a charge of discrimination with the Maryland Commission on Civil Rights on April 12, 2019.

ECF 14-3 ¶ 47.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  The moving party bears the burden of

showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp.

2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th

Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving

party's case, the burden then shifts to the non-moving party to proffer specific facts to show a

genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence

to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen.

Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in

support of the non-moving party's position will be insufficient; there must be evidence on which

the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere

speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter

Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to

provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving

party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting

*Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine

issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

III.    ANALYSIS

Plaintiff's Complaint contains two counts: (1) hostile work environment in violation of the Maryland Fair Employment Practices Act ("MFEPA"); and (2) retaliation, also in violation of the MFEPA.  Each claim is discussed below.

   A.  Hostile Environment

In Count One, Plaintiff alleges that Cenveo violated the MFEPA by subjecting him to a hostile work environment, which exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  The standards for evaluating a claim under the MFEPA are the same as those used to evaluate a Title VII claim.  *See Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735, 742 & n.8 (2007) (recognizing that "Title VII is the federal analog to" MFEPA and, thus, Maryland "courts traditionally seek guidance from federal cases in interpreting" the latter); *see also Hawkins v. Leggett*, 955 F. Supp. 2d 474, 496-97 (D. Md. 2013) (noting that federal courts use Title VII standards to judge discrimination and retaliation claims brought under MFEPA).  To establish a claim for a hostile work environment,

6

"a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted)). The severity and pervasiveness of harassment is assessed "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (internal quotation marks omitted). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable," depending on whether the harassment culminates in a tangible employment action. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332–33 (4th Cir. 2018). In contrast, harassment by a co-worker or a third-party, resulting in a hostile work environment, can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995)) (internal quotations omitted).

There is no question in this case that Plaintiff experienced unwelcome conduct that was race-based in nature. The contested issues relate to the latter two elements: whether the conduct was sufficiently severe and pervasive to establish a hostile work environment, and whether the conduct is properly imputable to Cenveo, the employer.

Turning first to the severity and pervasiveness of the conduct, Plaintiff has alleged a single use of a highly odious racial slur. It is true that in certain contexts, isolated uses of that term and like terms have been deemed sufficiently severe to evidence a hostile work environment. *See*

7

*Boyer-Liberto*, 786 F.3d at 280 (explaining that two uses of the epithet "porch monkey," by a supervisor, suffice to create a hostile work environment); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the n-word] by a supervisor in the presence of his subordinates.") (quoting *Rodgers v. Western-Southern Life Ins.* Co., 12 F.3d 668, 675 (7th Cir. 1993) (emphasis added)).  Those cases, as noted, involved supervisors targeting the offensive language towards their supervisees. *See Boyer-Liberto*, 786 F.3d at 278 ("In measuring the severity of harassing conduct, the status of the harasser may be a significant factor – e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'") (citation omitted).  In this case, Plaintiff has not identified which individual used the derogatory term, and has offered no evidence that any of his supervisors were culpable.

Instead, this case involves discriminatory conduct by an anonymous and unknown actor. Plaintiff suggests that the conduct is still sufficiently severe and pervasive to establish a hostile work environment, citing to *Pryor v. United Air Lines*, 791 F.3d 488, 496 (4th Cir. 2015), for the proposition that use of the "n-word" is "pure anathema to African-Americans."  While that is undoubtedly true, the *Pryor* Court did not make a blanket assessment of severity based on that fact alone.  Instead, it explained that the use of the "n-word" was one of four factors leading to its conclusion that the facts of that case, which involved two incidents of racist death threats left in company mailboxes, were sufficiently severe and pervasive to constitute a genuine issue of material fact.  In addition to the use of the n-word, the Fourth Circuit based its finding in *Pryor* on the express threats of racial violence, the fact that the threats were conveyed in a secure mailroom in an airport accessible only to company employees, and the fact that Plaintiff and other employees

had been subjected to other, albeit less threatening, instances of race-based discrimination. *See Pryor,* 791 F.3d at 496 ("Four considerations support that conclusion [of severity].").  Here, while not discounting the fact that Plaintiff was exposed to an abhorrent racial slur in a work setting and has articulated how the slur affected him, none of those other aggravating circumstances in *Pryor* were present.  The Statement was not made in conjunction with a threat of violence, the speaker cannot be conclusively identified as even a co-worker, and Plaintiff acknowledged no other race-based incidents during his tenure.  Under these circumstances, the isolated, anonymous conduct was not objectively "severe and pervasive" enough to establish a hostile work environment.

Moreover, Plaintiff has not presented evidence suggesting that the discriminatory conduct can be imputed to Cenveo as his employer.  To impute the unidentified individual's harassment to Cenveo, Plaintiff must show that Cenveo "knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end" it.  *Freeman*, 750 F.3d at 422-23 (quoting *Amirmokri*, 60 F.3d at 1131) (internal quotations omitted).

Here, Plaintiff has made no such showing.  His own description of the incident was, "And all of a sudden somebody comes across the – comes through the phone . . ."  ECF 14-12 at 12.  There is no suggestion that Cenveo could have prevented the entirely unexpected, one-time occurrence.  Moreover, Cenveo employees (including Veitch and Burger) promptly undertook to investigate the incident, attempting to ferret out the identity of the speaker.  Plaintiff's dissatisfaction with the scope and conduct of Cenveo's investigation focuses on the fact that Burger opted not to contact Plaintiff directly about what had occurred.  While one might generally expect an investigation of this nature to include an interview with the complainant, there is no "exhaustive list" or "particular combination of remedial measures or steps that an employer need employ to insulate itself from liability."  *E.E.O.C. v. Xerxes*, 639 F.3d 658, 669 (4th Cir. 2011).

Indeed, a number of facts make the failure to interview Plaintiff less troubling in the context of the broader investigation as a whole.    An interview of Plaintiff would not have answered the fundamental question of who uttered the slur.  At least some Cenveo decisionmakers knew Plaintiff did not know the speaker's identity prior to the start of the investigation—Plaintiff had already told McCord that he could not identify the person who made the statement and asked McCord for assistance to do that.  ECF 14-12 at 42:4-6. Thus, the decision not to interview Plaintiff in the course of the investigation did not compromise its effectiveness.  Plaintiff has not established that Cenveo's investigation was anything other than "reasonably calculated to end" the harassment by identifying the responsible party, if possible.  Moreover, while the unsuccessful investigation may have been entirely unrelated to this result, Plaintiff cites no further incidents of harassment occurring during his remaining tenure (or, for that matter, incidents occurring to any other African American employees after his tenure).  *See* ECF 14-12 at 39-40 (testimony confirming that he was never subject to any other racial slurs or comments based on race).  Cenveo had also furnished each employee with an employee handbook containing anti-harassment policies and procedures, evidencing its commitment to a harassment-free workplace.  ECF 14-3 ⁋ 10; ECF 14-12 at 104:13-107:18.

Certainly, no employee should be subjected to any use of the "n-word" at any time in any workplace.  But employers are not strictly liable for any improper conduct that occurs.  *See Pryor,* 791 F.3d 497.  In the circumstances of this case, and on the limited evidence submitted by Plaintiff, liability for the incident cannot be fairly imputed to Cenveo, and it cannot be held responsible for fostering or tolerating a hostile work environment.

### B.  Retaliation claim

Count Two alleges a claim for retaliation under the MFEPA, which is again governed by the same standards as a Title VII retaliation claim. Retaliation requires evidence "(1) that [plaintiff] engaged in a protected activity, (2) that the employer took a materially adverse action against him, and (3) [that] there is a causal connection between the protected activity and the adverse action." *Perkins v. Intern. Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019).  Certainly, Plaintiff fails to allege any direct evidence to substantiate that he was terminated in retaliation for his discrimination complaint, such as comments made by supervisors to suggest that they were aware of, or acting in reaction to, his protected activity.  However, if a plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation and the employer offers a non-retaliatory explanation for the adverse employment action, the plaintiff can proceed by meeting its burden to "persuad[e] the factfinder that the employer's proffered explanation is merely a pretext for [retaliation]." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).  To meet the causation component of a retaliation claim, the plaintiff must establish that his protected activity was not merely a motivating cause, but a "but-for" cause of the adverse action.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Beginning with the first factor, in considering whether a plaintiff's action constitutes protected "opposition activity," the Fourth Circuit has stated that "[o]pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *see also id.* ("Whether an employee has engaged in protected opposition activity, turns upon balancing 'the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress's equally manifest desire not to tie the hands of employers in the objective selection and

11

control of personnel.'") (ellipsis in original).  There is no doubt, then, that Plaintiff's report of the conference call incident to his supervisor, McCord, and his filing of a complaint with the Maryland Commission on Civil Rights on April 12, 2019, constituted protected activity.  There is also no doubt that Plaintiff's termination constituted an adverse employment action.

The issue, then, is whether Plaintiff can establish a causal "but-for" link between his protected activity and his termination.  Plaintiff cites the temporal proximity between the April incident and his May 1 termination, in addition to his perception that there were no other reasons for terminating him.  There is some question as to whether temporal proximity alone suffices to establish causation when "but-for" causation is required.  However, even assuming arguendo that Plaintiff had sufficient evidence for a prima facie case as to causation, he lacks any evidence to prove that Cenveo's legitimate non-discriminatory reason for his termination is false or pretextual. Plaintiff has not countered the uncontroverted evidence that Veitch's and Burger's decision to eliminate his position as part of a larger response to budgetary concerns was made long before the April 9, 2019 conference call.  Only an unfortunate coincidence resulted in his termination happening in close proximity to the incident.  *See, e.g.*, ECF 14-3 (Burger Aff. ¶¶ 16-26) (describing how decision to eliminate Plaintiff's position was made in December, 2018 on the basis of his lack of seniority); ECF 14-3 at 13 (email discussing need to reduce staff at Hurlock); ECF 14-3 at 16 (notes from February 2019 discussing strategy for reassigning Plaintiff's tasks); ECF 14-3 at 20 (email exchange reflecting request to eliminate Plaintiff's position and one other position on April 9, 2019, with the approval received on April 10, 2019).  Although Plaintiff was not informed of management's preexisting decision to eliminate his position until his termination on May 1, 2019, he offers no evidence suggesting that Cenveo's justification is false or manufactured.  In fact, the simultaneous elimination of another employee's position, along with

the contemporaneous emails and notes evidencing the decision-making process well preceding April, 2019, all corroborate Cenveo's position.  Because Plaintiff bears the burden of adducing evidence to prove each element of his claim at the summary judgment stage, the absence of any evidence of pretext is fatal to his retaliation claim.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 14, will be GRANTED, and this case will be closed.  A separate Order follows.


Dated:  March 11, 2021                                    _____/s/_____
                                                                         Stephanie A. Gallagher
                                                                         United States District Judge